# United States District Court

**MIDDLE** _____ DISTRICT OF _____ **ALABAMA** _____

<table>
<tr>
<td>
<b>In the matter of the Search of</b><br>
(Name, address or brief description of person, property or premises to be searched)<br><br>
Dell, Optiplex 745 computer,<br>
Serial Number 9985XB1, and cubicle next to break area inside Building 1120, Fort Rucker, Alabama
</td>
<td>
APPLICATION AND AFFIDAVIT<br>
FOR SEARCH WARRANT<br><br>
CASE NUMBER: <i>1:07MJ68-TFM</i>
</td>
</tr>
</table>

I _____ Phillip T. McCluskey _____ being duly sworn depose and say:

I am a(n) __ Special Agent, United States Army Criminal Investigative Division __ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

Dell, Optiplex 745 computer, Serial Number 9985XB1

in the _____ Middle _____ District of ____ Alabama _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

**SEE AFFIDAVIT**

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Title 18, United States Code, Section 2252A.

The facts to support the issuance of a Search Warrant are as follows:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

July 12, 2007 @ 345pm _____ at _ Montgomery, Alabama _
Date                                                    City and State

Terry F. Moorer, U.S. Magistrate Judge _____
Name & Title of Judicial Officer                    Signature of Judicial Officer

# AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND

For use of this form, see AR 27-10; the proponent agency is TJAG.

*BEFORE COMPLETING THIS FORM, SEE INSTRUCTIONS ON PAGE 17*

**1. I,** Special Agent Phillip T. MCCLUSKEY, Fort Rucker CID Office, 24th MP Det (CID), Fort Rucker, AL 36362 **having been duly sworn, on oath depose and state that:**

## INTRODUCTION AND AGENT BACKGROUND

    a. I make this affidavit in support of an application for a search authorization of Mr. Terry L. MYERS' government computer, and his personal work area. As set forth herein, there is probable cause to believe that within the computer storage devices of Mr. MYERS' government computer described as a Dell, Optiplex 745, Serial Number: 9985XB1; and the personal work area of MYERS which was a cubical located next to the break area inside Building 1120, DOL, FRAL, there exists evidence of violations of 18 U.S.C. § 2252 and 2252A, (Activities relating to material involving the sexual exploitation of minors).

    b. I have been a Special Agent in the United States Army Criminal Investigation Command (CID) since Feb, 2004. I was an intern and trained with CID for a year before becoming a Special Agent. Specifically, I have received almost 100 hours of combined training in Computer Search and Seizure; Child Abuse Prevention and Investigative Techniques; and Child Pornography. I am authorized to investigate violations of the United States Code, including Title 18, United States Code, Sections 2252 and 2252A (Activities relating to material involving the sexual exploitation of minors), the Uniform Code of Military Justice and state laws where there is an Army interest. I have conducted many investigations which resulted in the successful prosecution of individuals for violations of the Uniform Code of Military Justice, the United States Code, and the Arizona Revised Statutes. During the course of these investigations I have executed numerous searches which resulted in the seizure of evidence needed for prosecution.

    c. Based upon my training and experience, I am familiar with the means by which individuals use computers and information networks such as the Internet to commit various criminal offenses. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the PREMISES. In addition, the information contained in this affidavit is from my review of various documents and records, my personal observations and knowledge, and from information provided to me by CPT GOLDEN, LTC SMIDT, Mr. FULFORD, Mr. HANEY, INV BOWEN, Ms. LEMONS, Ms. FORRESTER and other law enforcement officers involved in this investigation.

## DEFINITIONS:

    a. "Child Erotica" are materials or items that are sexually arousing to pedophiles but that are

---

DA FORM 3744-E, Mar 85 (gen)           Page 1 of 17  Pages

AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND (CONTINUED)

not in and of themselves obscene or which do not necessarily depict minors in sexually
explicit poses or positions.

b.  "Child Pornography," as used in this affidavit, includes the definition in 18 U.S.C., Sec
    2256, as well as any visual depiction, the production of which involves the use of a minor
    engaged in sexually explicit conduct (See 18 U.S.C., Sec 2252)

c.  The term "computer" as used herein, is defined pursuant to 18 U.S.C., Sec 1030(e)(1), as
    "an electronic, magnetic, optical, electrochemical, or other high speed data processing
    device performing logical or storage functions, and includes any data storage facility or
    communications facility directly related to or operating in conjunction with such
    devices."

d.  "IP address" refers to a unique number used by a computer to access the Internet.  IP
    addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a
    different unique number to a computer every time it accesses the Internet.  IP addresses
    might be static whereby the user's ISP assigns his computer a unique IP address and that
    same number is used by the user every time his computer accesses the Internet.

e.  "Browser" refers to a software application that allows a computer user to navigate, or
    "surf", the Internet.  Common browser applications include Microsoft's Internet Explorer
    or Netscape Navigator.

f.  The terms "records," "documents," and "materials" include all information recorded in
    any form, visual or aural, and by any means, whether in handmade form (including, but
    not limited to, writings, drawings, paintings), photographic form (including, but not
    limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures,
    photocopies), mechanical form (including, but not limited to, phonograph records,
    printing, typing) or electrical, electronic or magnetic form (including, but not limited to,
    tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as
    floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital
    Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer
    buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or
    electronic notebooks, as well as digital data files and printouts or readouts from any
    magnetic, electrical or an electronic storage device).

g.  "Sexually Explicit Conduct" means actual or simulated (a) sexual intercourse, including
    genital-genital, oral-genital, or oral-anal, whether between persons of the same or
    opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e)
    lascivious exhibition of the genitals or pubic area of any person.

h.  "URL" or "Uniform Resource Locator" refers to Internet addresses.  Each file on the

DA FORM 3744-E, Mar 85 (gen)

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

Internet has a unique address called a Uniform Resource Locator, more commonly known as URL.

i.  "Visual Depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image. (See 18 U.S.C., Sec 2256(5)).

## USE OF COMPUTERS WITH CHILD PORNOGRAPHY:

a.  It is the training and experience of your affiant that computers are used by individuals who exploit children (including collectors of child pornography) to:  a) correspond with like-minded individuals via e-mail, chat, bulletin boards, newsgroups, instant messages, file transfers and other means; b) store identifying information concerning child victims, as well as identifying information about other individuals who share the same interests; c) locate, view, download, collect and organize images of child pornography found through the Internet.  Computers also afford individuals a degree of anonymity.

b.  The Internet is a worldwide network of computer systems operated by governmental entities, corporations, other commercial entities and universities.  To access the Internet, an individual computer user must subscribe to an Internet Service Provider (ISP), which operates a host computer system with direct access to the Internet.  In the work environment, many governmental entities, corporations and universities provide employees and students with access to the Internet.

c.  A device known as a modem allows any computer to communicate with another computer through the use of telephone lines or cable.  The modem may be internal or external to the computer.  A Network Interface Card (NIC) performs the same functions as a modem for cable connections, such as that used on the Non-Secure Internet Protocol Router Network (NIPRNET).

d.  By connection to the Internet, either through a commercial ISP or through access provided by a private service provider such as the government, an individual with a computer can make electronic contact with millions of computers around the world.

e.  With the modem or NIC, a computer user can transport a computer file or executable file, sometimes referred to as a program, to his own computer, so that the computer file is stored in his computer.  The process of transporting a file or program to one's own computer from another is called "downloading."

f.  The user can then view the file on his/her computer screen (monitor), and can "save" or retain the file on his/her computer for an indefinite time period.  The user can also

DA FORM 3744-E, Mar 85 (gen)                          Page 3 of 17  Pages

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

"execute" or "run" a downloaded program.

g.  In addition to permanently storing the file on the computer, the user may print the file or execute the program. The original file that was downloaded is also maintained in the originating computer.

h.  With the modem or NIC, a computer user can send a file from the computer to another individual on the Internet. This process of sending a file is called "uploading."The process of "uploading" is similar to the "downloading" process except the user is sending the computer file or program to others instead of retrieving the information from another computer. As with the process of "downloading," the original file is maintained on the originating computer.

i.  A user can also use e-mail to send files or programs to another individual on the Internet. Again, the original file is maintained on the originating computer. Users commonly configure the email program to save not only e-mail received but a copy of all "sent" e-mail. These copies will remain on the computer until they are deleted. If the e-mail program operates from a server on which the user's files are stored and retrieved as needed, the files are likely to be archived by the system administrator on a regular basis.

j.  Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. These online storage accounts are often free, but can involve a charge. Payment is almost always made via credit card, debit card, or other similar payment service.

k.  A subscriber assigned a free online storage account frequently can set up such accounts by providing limited identifying information. Any information provided is frequently fictitious in an attempt to preserve the anonymity of the user. Consequently, even if it is known that a collector or distributor of child pornography is a subscriber of a free online storage service, the service provider frequently will have no records in that subscriber's name. Instead, the online service will only be able to identify files, including child pornography, that are associated with a "login," or unique, user-created identity the subscriber uses to "log on" to the online service.

l.  Such an online storage account is particularly useful to a collector or distributor of child pornography. Such a subscriber can collect, store, view and distribute electronic images, including child pornography, directly from the online service. Consequently, the illegal files have minimal contact with the subscriber's home computer. The subscriber can also

AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND (CONTINUED)

manipulate the files on an online storage service from any computer connected to the
Internet.

m. As is the case with most digital technology, communications by way of computer can be
saved or stored on the computer used for these purposes. Storing this information can be
intentional, i.e. by saving an email as a file on the computer or saving the location of
one's favorite websites in, for example, "bookmark" files. Digital information can also
be retained unintentionally, e.g. traces of the path of an electronic communication may be
automatically stored in many places (e.g. temporary files or ISP client software, among
others). In addition to electronic communications, a computer user's Internet activities
generally leave traces or "footprints" in the web cache and history files of the browser
used. In other words, if a computer user were to go to the website called "Lolita.com," a
"footprint" in the browser cache may be found pointing to that website, indicating that
particular computer was used to visit that website.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS:

a. Additionally, the majority of individuals who collect child pornography are persons who
have a sexual attraction to children. They receive sexual gratification and satisfaction
from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who collect child pornography collect sexually explicit
materials, which may consist of photographs, magazines, motion pictures, video tapes,
books, slides, computer graphics or digital or other images for their own sexual
gratification. The majority of these individuals also collect child erotica, which may
consist of images or text that do not rise to the level of child pornography by which
nonetheless fuel their deviant sexual fantasies involving children.

c. The majority of individuals who collect child pornography rarely, if ever, dispose of their
sexually explicit materials and may go to great lengths to conceal and protect them from
discovery, theft, and damage to their collections of illicit materials.

d. The majority of individuals who collect child pornography often seek out like-minded
individuals, either in person or on the Internet, to share information and trade depictions
of child pornography and child erotica as a means of gaining status, trust, acceptance and
support. This contact helps these individuals to rationalize and validate their deviant
sexual interest and associated behavior. The different Internet-based vehicles used by
such individuals to communicate with each other include, but are not limited to, email,
email groups, bulletin boards, Internet relay chat (IRC), newsgroups, instant messaging,
and other similar vehicles.

e. The majority of individuals who collect child pornography maintain books, magazines,

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

f.   The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

**SPECIFICS OF SEARCHES AND SEIZURES OF COMPUTER SYSTEMS:**

a.   Based on my training, my experience and on consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related media, I know that searching and seizing information for evidence or instrumentalities of a crime from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) and data security devices (including passwords) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true for the following reasons:

b.   Computer storage devices (such as hard disks, diskettes, tapes, laser disks, CD-ROMs, DVDs, Bernoulli drives, etc.) can store the equivalent of hundreds of thousands of pages of information. Much of this information may be unrelated to the focus of the search but is commingled with relevant information in a way that does not permit it to be easily or safely separated. Additionally, a suspect may try to conceal criminal evidence, and he might store criminal evidence in random order or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

c.   Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. These experts maybe located outside the Judicial District the initial search is conducted in. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes embedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis. Hence, CID may find it necessary to conduct the actual search of the seized computer system in a controlled environment either in the Judicial District the initial search was conducted in or elsewhere.

d.  Based upon your Affiant's training, experience, and consultation with experts in computer searches, data retrieval from computers and related media, and consultations with other agents who have been involved in the search of computers and retrieval of data from computer systems, your Affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

e.  The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly reconfigure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating system, interfaces, and hardware drivers) and any application's software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices. If the analyst determines that the I/O devices, software, documentation, and data security devices are not necessary to retrieve and preserve the data after inspection, the government will return them within a reasonable time.

f.  In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application's software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

The Fort Rucker computer network installed safeguards for accessing the network. In order for a computer to have access to the network, the computer must be equipped with Common Access Card (CAC) hardware and software. A CAC is an identification card equipped with a computer chip that stores information specific to the person the CAC is issued to. A computer will not be able to use the Fort Rucker computer network unless an individual with a CAC logs into that computer under their individual profile on the computer. In order for an individual to "login" to

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND** (CONTINUED)

a computer on the Fort Rucker computer network, he must insert his CAC into the CAC reader
and enter his Personal Identification Number (PIN), which will then open that individual's
personal account on that computer.

## INFORMATION SPECIFIC TO THIS APPLICATION:
**2. The affiant further states that:**    On 21 Jun 07, CPT Nathan T. GOLDEN, Trial Counsel,
SJA, Fort Rucker, AL 36362 (FRAL), reported someone found child pornography on a
computer.

    a.    On 21 Jun 07, your affiant and INV R. Scott LEE, Fort Rucker CID Office, coordinated
with GOLDEN and LTC Michael L. SMIDT, SJA, FRAL.  SMIDT provided a
memorandum which detailed on 20 Jun 07, Mr. George W. STEUBER, Deputy Garrison
Commander, FRAL, and Mr. H. Vance HANEY, Director, Internal Review and Audit
Compliance Office, FRAL, informed SMIDT they believed Mr. Terry L. MYERS,
Property Administrator, Directorate of Logistics, FRAL, was involved in government
credit card fraud and suspected he was viewing child pornography on his government
computer.  HANEY provided SMIDT with an internet history, including web site
activity, for the IP address 155.147.28.224, which was assigned to MYERS' computer,
and Government Credit Card Transaction details for MYERS' account.

    b.    On 21 Jun 07, your affiant coordinated with Mr. C. Richard FULFORD, Information
Technology Manager, Mission Support Chief, Directorate of Information Management
(DOIM), FRAL, who related between 1 May 07 and 21 Jun 07, the computer listed under
the IP address 155.147.28.224, lists only five different log-in names.  Between 1 May 07
and 21 Jun 07, Mr. Terry Lee MYERS logged into the computer almost daily, except
between 8 Jun 07 and 17 Jun 07, when there was no activity on the computer. Mr. Shawn
FOIST, Network Security Manager, DOIM, FRAL, logged into the computer once; Mr.
William J. PAYNE, Information Management Officer, DOL, FRAL logged on to the
computer once; Mr. FULFORD logged on to the computer once; and there were several
anonymous "log-ons" listed on the computer, which Mr. FULFORD related were the
result of computer security scanners and software.

    c.    On 21 Jun 07, your affiant and INV LEE looked up the "flukiest.com" website from the
internet history (491 hits), which resulted in a website that required a log-in and password
and advertises itself as a Photo sharing, Video sharing and Blogging website. There are
several thumbnail type photos on the homepage which show videos and indicate the
length of the video and the username of the individual that posted the video.  Your affiant
and INV LEE also looked up "pixilis.com" (235 hits) which also was a photo and video
file sharing website, which also required a username and password for portions of the
site.  There were lots of thumbnails of children in the video section of the website, with
the username of the individual that posted the videos.  Further, your affiant and INV LEE
looked up MYERS in the Alabama sex offender database, which he was not in.

---

DA FORM 3744-E, Mar 85 (gen)                                   Page 8 of 17  Pages

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND** (CONTINUED)

d. On 21 Jun 07, your affiant and INV LEE interviewed HANEY who provided a statement
wherein he stated he found that MYERS defrauded the government for less than $10.00.
HANEY stated Ms. Patricia T. LEMONS, Chief, Plans and Operations Division, DOL,
FRAL, provided him with two long distance personal phone calls and a stack of papers
containing web sites MYERS visited utilizing his government computer. HANEY stated
he investigated some of those websites and found them to have young girls as the overall
theme and some live video of young looking girls taking their clothes off. HANEY
provided this office with the list of internet websites. After a review of the list of
websites by SA MCCLUSKEY and INV LEE, several of the site names raised suspicions
of containing child pornography.

e. On 25 Jun 07, your affiant coordinated with INV Brandi BOWEN, Juvenile Unit, Dothan
Police Department (DPD), Dothan, AL, who related MYERS had two children in his
house in 2003 as foster children, one boy, and one girl born in 1997. The girl made an
allegation that MYERS put his hand in her bathing suit bottom, tongue in her mouth, and
touched her on her vagina with his finger a lot. An interview of her brother, 5 yr-old at
the time, revealed his sister told him MYERS made her lick his penis. In a later
interview of the girl, she stated MYERS put part of his penis in her mouth. Dothan PD
had a sexual assault examination done on the girl and the examination did not reveal any
sexual assault. INV BOWEN related MYERS was administered a polygraph and failed,
then he paid for a second polygraph and passed. The girl stated she witnessed MYERS
kiss the next door neighbor girl, but when the investigators interviewed the parents of the
neighbor girl, they would not give consent to interview the child and did not cooperate
with the investigators. INV BOWEN related CPL Brian CHERRY, juvenile unit, Dothan
PD, was the investigating officer of the allegation, and the allegation was dropped
because the foster children were removed from the house and the people that adopted the
foster children did not want to pursue charges, but wanted the investigation to go away.
INV BOWEN stated CPL CHERRY related there was a computer in the MYERS house
at the time of the investigation, but it was never seized or examined.

f. On 26 Jun 07, your affiant and INV LEE interviewed Mrs. Agnes MYERS, spouse of Mr.
MYERS, while at the Trinity Lutheran Learning Center, 116 Luther Way, Dothan, AL
36301, where she is a teacher of four and five year olds. Mrs. MYERS stated she and her
husband have three computers in their house, two laptops and one regular computer.
Mrs. MYERS also stated Mr. MYERS creates all the slide shows and photo presentations
for her school and their church.

   – On 22 Jun 07, your affiant asked Mr. MYERS whether he was any good with
     computers, to which Mr. MYERS replied he was pretty good.

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

g. On 27 Jun 07, your affiant and INV LEE interviewed LEMONS who stated she became aware of MYERS' fraudulent Travel Voucher when she received an email from Ms. Marge SIMMONS, Management Analyst, Directorate of Resource Management (DRM), FRAL, which detailed MYERS' travel card was 30 days past due and had suspicious charges on it. LEMONS stated this email was sent on 14 Jun 07, but she did not look at it until 15 Jun 07, which was MYERS' regular day off. LEMONS stated MYERS normally worked from 0630 until 1615, and had every other Friday off. LEMONS stated she had been suspicious of MYERS' computer use for some time because he stayed at his desk a lot on the internet. LEMON related this information to HANEY and also advised HANEY that she was going to contact DOIM to attempt to verify her suspicion. LEMONS stated HANEY related MYERS had past problems with making long distance telephone calls. LEMONS stated she used to be MYERS direct line supervisor and stated he was not completing his duties at work due to what LEMONS believed to be personal activity on the internet. LEMONS stated she could see MYERS' computer from a space between the wall and the edge of his cubicle at the Southeast corner of his work area. LEMONS stated she walked past the space in the cubicle several times over the past year and saw pictures of what appeared to be young people on MYERS' computer monitor. However, by the time she would get around to the entrance of his cubicle, the pictures would be removed due to the fact that she believed MYERS could hear her walking and have only text on his monitor screen. LEMONS stated she contacted DOIM and requested MYERS internet activity.

h. On 27 Jun 07, your affiant and INV LEE interviewed Ms. FORRESTER who stated she was Mr. MYERS' direct line supervisor and had never seen anyone else use Mr. MYERS' computer. Ms. FORRESTER stated she began working in her position on 3 Oct 05. Ms. FORRESTER stated she witnessed Mr. MYERS use a flash drive on his computer and gave him a counseling statement for taking work to his residence to work on.

i. On 29 Jun 07, SA Jeffery C. BOOTH, 6204, Fort Rucker CID Office, coordinated with SA Arthur P. ROCHE, Federal Bureau of Investigations, Crimes Against Children, Mobile, AL, who conducted an internet search using web site names provided to him by SA BOOTH which were taken from the printout of internet sites that MYERS was visiting. Of the sites searched, WWW.LEAH-MODEL.COM, WWW.LIZZY-MODEL.COM, and WWW.SWEET-STRAWBERRY.ORG were determined to be Child Erotica websites, which SA ROCHE described as illegal sites. SA ROCHE explained that the web sites contained images of preteen children posed provocatively in underwear, tight shorts, bathing suits, and skimpy clothing. SA ROCHE printed out copies of the images and stated he would send them to this office via Fed-Ex, as the web sites often disappear.

AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND (CONTINUED)

j.  On 2 Jul 07, your affiant interviewed HANEY who stated while at his home computer, he
and his wife visited between 30 and 40 websites that Mr. MYERS visited or attempted to
visit on his government computer. HANEY stated he visited three websites that directed
his browser to "wellcams.biz". The sites were: "preteen-model-picture-
751f4.girlcamsworld.info", "maryl.pixilis.com", and "russian-preteen-model-
751f4.camerasera.info". HANEY stated when he attempted to access the first of these
three sites his browser was directed to the "wellcams.biz" website, which he described as
a live webcam of a very young looking oriental girl between the ages of 13 and 14
because her breasts were not developed, her face looked young, she had bows in her hair,
and her demeanor seemed young. HANEY stated you could tell someone was directing
her on what to do because she was not looking at the camera, she was looking off to the
side of the camera. HANEY stated she would take something off, look away from the
camera, then start taking off something else and look up at the camera. HANEY
described the angle of the camera placement as above her and to the left while she was
sitting on a bed or some type of platform. HANEY stated she was wearing a white button
blouse, a dark skirt, with suspenders, and took off everything, including her panties that
were white. HANEY stated he entered the website at that point and there were pages and
pages of different webcam sites with a picture of the girl at each site and you had to enter
your account number and password to view the actress. HANEY stated each of the
pictures had a description of the actress by nationality and listed how many credits it took
to watch her. HANEY stated each one of the sites took him back to the "wellcams.biz"
website and there was a different girl performing, but he did not stay at the website
because he recognized the "wellcams.biz". HANEY stated he went down the list of the
site activity which took him to many "photosharing" websites that required an account
number and password to enter. HANEY stated he did not believe Mr. MYERS could see
that many photographs of his grandchildren on that many different "photosharing"
websites. HANEY stated he also visited individual websites based on the name which
were websites with young girls or websites about young girls such as "myfirstbra.com".
HANEY described some of the websites such as "eiriksdottir.com" as a young girl in
glamour shots with different types of clothes on; such as evening gowns, cheerleading
outfits, and other clothes. HANEY stated there were other girls with the same type of
websites, but he could not recall the names of the websites. HANEY stated he marked an
"X" next to three websites, "preteen-child-model-751f4-girlcamsworld.info", "preteen-
model-bbs-751f4-hiddenlimocams.info", "preteen-model-top-100-751f4-
spycamssite.info" because the website was moved to a different location and did not give
an indication as to how to get there.

k.  A review by your affiant of the site activity list identified the "preteen-model-picture-
751f4.girlcamsworld.info" website as being visited four times and was never blocked; the
"maryl.pixilis.com" website was visited three times and was never blocked; and the
"russian-preteen-model-751f4.camerasera.info" was visited once and was not blocked.

The common link between the websites was "751f4".

l.  On 2 Jul 07, your affiant conducted a search of the internet of websites HANEY visited to see if those websites still showed little girls in nude, sexually explicit positions. Your affiant visited "preteen-model-picture-751f4.gircamsworld.info" and "russian-preteen-model-751f4.camerasera.info" and both websites connected directly to "http://www.wellcams.com/exec/customer/chatr.jsp?affiliate_pro_tracking_id=751:4:1". This wellcams.com website attempted to connect to a "video stream", but timed out on the connection and automatically forwarded to "http://www.wellcams.com/exec/join" which was a page used to join the website using a "username" and password. In an attempt to connect directly to "www.wellcams.biz", the website homepage was a welcome page for "Affiliate Pro" under the name "wellcams.com" and advertised "New models daily", "Free Nude shows", "Free 10 minutes of private video chat", and "Free registration". The advertised cost to signup was $35.00 per signup. Your affiant also researched "maryl.pixilis.com" which was the homepage of "Maryl". Maryl's website was a photo sharing and blogging website. Your affiant researched "eiriksdottir.com" (translation: eriksdaughter.com), which was a homepage written in a foreign language that showed pictures of an adult male and female, and a juvenile female approximately two years old, and a juvenile male and another female both between the approximate ages of 8 and 13, in what appeared to be vacation family photos between Jul 2006 and Jun 2007. Your affiant researched "brazilbeachkids.com", which was a children's swimwear website; "www.hollywoodbabeinc.com", which was advertised as a clothing web site for children. Upon entering "www.hollywoodbabeinc.com", there were photographs of girls around the ages of four to seven in modeling type photographs. Your affiant researched "www.starboxx.de" which appeared to be a website in German and was a centralized location for models and agents to meet. Your affiant researched "lulu.com", which appeared to be a publishing website, and "crueltobekind.org" which appeared to be a political website of a German citizen who appeared to be speaking out against censorship on the internet. Your affiant also researched the "myfirstbra.us" website which was an educational website for girls and parents on a girl's first bra, puberty, and physical development. Under the portion of the website for girl links were the websites "locks of love", "kidkountry", and "Girl Power!".

m.  On 3 Jul 07, SA BOOTH and SA Shirley HAWKINS, this office, received the printed images from the websites SA ROCHE looked up from his office. A review of the web site print outs disclosed what appeared to be underage females dressed provocatively and posed in positions of a sexual nature. The web sites accessed by SA ROCHE were identified as http://www.sweet-strawberry.org/ and http://lizzy-model.com/index1.html.

n.  On 3 Jul 07, your affiant coordinated with Dr. Maria C. SUCGANG, Pediatrician, Lyster Army Health Clinic (LAHC), FRAL, and presented the images sent to this office from SA ROCHE, which were downloaded from "www.sweet-strawberry.org" and "lizzy-

AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR
APPREHEND (CONTINUED)

model.com". Dr. SUCGANG reviewed the images from "http://www.sweet-strawberry.org" and stated almost all the images appeared to be of children. Dr. SUCGANG gave the following estimations regarding the ages of the females depicted in the images:

> On page 1 of 5, Image titled "Magazine Fashion #2" - estimated under 6 years old; Images titled "Magazine Fashion #19 and 34" - between 8 and 12 years old; image titled "Lena Magazine Fashion" - probably preteen, but needs to be able to see the chest; Image titled "Magazine Fashion #5" - Dr. SUCGANG could not tell; Image titled "Magazine Fashion #20" - between 8 and 12 years old; Image titled "Anni Magazine Fashion" - between 8 and 12 years old; Image titled "Ira Magazine Fashion" - between 6 and 8 years old; Image titled "Magazine Fashion #4" - under 6 years old; Image titled "Magazine Fashion #1" - between 8 and 10 years old; Images titled "Magazine Fashion #45", "Natasha Magazine Fashion" and "Magazine Fashion #24" - appeared to have started puberty and were probably aged between 10 and 14 years old; Image titled "Magazine Fashion #39" - under 6 years old; Image titled "Vika Magazine Fashion" - probably 8 to 10years old; Images titled "Magazine Fashion #48 and #44" - between 8 and 10 years old; Image titled "Magazine Fashion #30" - between 6 and 8 years old; Image titled "Magazine Fashion #9" - between 8 and 12 years old; and Image titled "Katya Magazine Fashion" - between 8 and 10 years old.

> - On page 2 of 5, Dr. SUCGANG estimated the entire first row (Images titled "Magazine Fashion #22 and #32, Oly Magazine Fashion, #25 and #43" - between the ages of 8 and 10 years old; On the 2nd Row, Images titled "Magazine Fashion #37 and Super Magazine" - were between 6 and 8 years old, while the rest (Images titled "Magazine Fashion #23, #46 and #7" - were between 8 and 14 years old; the 3rd Row, Images titled "Magazine Fashion #10 and #3" - were below 6 years old, while Images titled "Magazine Fashion #17, #15, and #38" - were between 10 and 14 years old; the 4th Row, all the images (Images titled "Magazine Fashion #33, Alena Magazine Fashion, #6, #18, and #21") appeared to be between 8 and 12 years old; on the 5th Row, Images titled "Magazine Fashion #13 and #31" - were between 6 and 8 years old, while Images titled "Magazine Fashion #12, #14 and #27" - were between 8 and 12 years old.

> - On page 3 of 5, Dr. SUCGANG estimated on the 1st Row images titled "Magazine Fashion #36, #47 and #42" - were between 8 and 12 years old, while Image titled "Magazine Fashion #26" - appeared to be under 6 years old, and image titled "Magazine Fashion #8" - was not determined because the face looked older than the body; the 2nd Row Images titled "Magazine Fashion #29 and #41" - were between 6 and 10 years old, Images titled "Magazine Fashion #35 and #11" - appeared between 12 and 16 years old; and Image titled "Magazine Fashion #28" - could not be determined; on the 3rd Row both the images (Images titled "Magazine Fashion #40 and #16" - appeared between 8 and 12 years old.

- Dr. SUCGANG reviewed the images from the "http://lizzy-model.com/index1.html" website and stated the images all appeared to be the same girl with images taken over an age range of 8 to 12 years old.

o. On 11 Jul 07, your affiant received a Technical Assistance (TA) Report from Ms. Sarah R. OHLSEN, Senior Analyst, Exploited Child Division, National Center for Missing and Exploited Children (NCMEC), which detailed your affiant provided a list of websites to be compared to the TA database for possible prior hits. A review of the report indicated the following websites were previously listed as having confirmed child pornography on their individual web sites: "innocent-youth.com"; "ss3.sexshare.com"; "lolita-street.com"; "i28.photobucket.com"; "i16.photobucket.com"; "i13.photobucket.com"; and "sapo.pt". Of these websites, all but the "sapo.pt" website were blocked by the Fort Rucker network. The following sites were also listed as having child pornography; however, the images had not been confirmed as being child pornography: "leah-model.com"; "lizzy-model.com"; "stumbleupon.com"; "good-times.webshots.com"; and "pageantworld.net".

p. On 22 Jun 07, agents from this office seized the government computer of Mr. MYERS (Dell, Optiplex 745, serial no. 9985XB1) in order to preserve evidence of a crime. The computer was taken to the evidence depository at Fort Benning, GA, because the computer forensic examiner is located at that location. Upon completion of the computer examination, the computer will be returned to the evidence depository of this office until adjudication is completed. The computer was seized from Mr. MYERS' work area, the cubicle next to the break area in Building 1120, Fort Rucker, Alabama. Mr. MYERS' cubicle contains a desk, filing cabinet, and cabinets.

q. It is paramount to the resolution of this investigation, that a search of MYERS' government computer and personal work area be conducted to locate and seize any evidence of possession and distribution of child pornography and all related storage media.

r. The majority of individuals who collect child pornography often collect, read, copy or maintain images and stories or "trophies," for many years, and it is likely the files containing child pornography are currently located on the requested storage media, even if they were deleted. There is probable cause to believe the computer and its storage devices, which may be stored in  are all instruments of the crimes of receipt, distribution, and possession of child pornography, in violation of law, and should all be seized.

**3. In view of the foregoing, the affiant request that a search warrant be issued for the search of:** Mr. MYERS' government computer, described as a Dell, Optiplex 745, Serial Number: 9985XB1, which was used by MYERS; and the personal work area of MYERS which was a cubical located next to the break area inside Building 1120, DOL, FRAL; **and seizure of:**

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

a) Any digital evidence described as computer photographs, graphic interchange formats and/or photographs, slides or other visual depictions of such graphic interchange format equipment which may be, or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica found on Mr. MYERS' government computer. Additionally any computers, central processing units, external and internal drives, external and internal equipment or media, terminals or video display units, optical scanners, computer software, computerized data storage devices (including data stored on hard disks or floppy disks, computer printouts or computer programs), computer or data processing software or data, including: hard disks, floppy disks, tapes, cassettes, video cassette tapes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media, floppy disks, tape systems and hard drive and other computer related operation equipment, found in Mr. MYERS' personal work area, including authorization to conduct off-site forensic examination of any such items found.

b) Any and all correspondence pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 whether transmitted or received using a computer, a facsimileor means of interstate commerce, common carrier, or mail.

c) Any and all correspondence pertaining to the travel in interstate commerce for the purpose of engaging in sexual activities with minors. The term minors as used in this list of items to be seized means persons under the age of 18 years.

d) Any and all books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e) All originals and all copies and all negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f) Any and all envelopes, letters, and other correspondence offering to transmit through interstate commerce including by United States Mails or by computer, any visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

g) Any and all envelopes, letters and other correspondence identifying persons transmitting, through interstate commerce including by United States Mail or by Computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

h) Any and all books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, request, trades, purchases, or transactions of any kind involving the transmission, through interstate commerce including the United States Mails or by Computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

i) Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States Mails, or by computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

j) Any Address Books, names, and lists of names and addresses of minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

k) Any and all diaries, notebooks, notes and any other records reflecting personal contract and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

l) Any and all materials and photographs depicting sexual conduct, whether between adults or between adults and minors, or minors and minors.

| TYPED NAME AND ORGANIZATION OF AFFIANT: | SIGNATURE OF AFFIANT: |
|---|---|
| SA Phillip T. McClulskey<br>Fort Rucker CID Office, 24th MP Det (CID), FRAL | |

SWORN TO AND SUBSCRIBED BEFORE ME THIS 12th DAY OF JULY, 2007,    AT 1545 HRS, AT MONTGOMERY, AL.

| NAME, ORGANIZATION AND OFFICIAL CAPACITY OF AUTHORITY ADMINISTERING THE OATH: | SIGNATURE OF AUTHORITY ADMINISTERING THE OATH: |
|---|---|
| Terry F. Moorer<br>U.S. Magistrate Judge<br>Middle District of Alabama | |

DA FORM 3744-E, Mar 85 (gen)

Page 16 of 17  Pages

**AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND** (CONTINUED)

# INSTRUCTIONS FOR
## *AFFIDAVIT SUPPORTING REQUEST FOR AUTHORIZATION TO SEARCH AND SEIZE OR APPREHEND*

1.  In paragraph 1, set forth a concise, factual statement of the offense that has been committed or the probable cause to believe that it had been committed. Use additional page if necessary.

2.  In paragraph 2, set forth fact establishing probable cause for believing that the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended are connected with the offense mentioned in paragraph 1, plus facts establishing probable cause to believe that the property to be seized or the person(s) to be apprehended are presently located on the person, premises, or place to be searched. Before a person may conclude that probable cause to search exists, he or she must first have a reasonable belief that the person, property or evidence sought is located in the place or on the person to be searched. The facts stated in paragraph 1 and 2 must be based on either the personal knowledge of the person signing the affidavit or on hearsay information which he/she had plus the underlying circumstances from which he/she has concluded that the hearsay information is trustworthy. If the information is based on personal knowledge, the affidavit should so indicate. If the information is based on hearsay information, paragraph 2 must set forth some of the underlying circumstances from which the person signing the affidavit has concluded that the informant (whose identity need not be disclosed) or his/her information was trustworthy. Use additional pages if necessary.

3.  In paragraph 3, the person, premises, or place to be searched and the property to be seized or the person(s) to be apprehended should be described with particularity and in detail. Authorization for a search may issue with respect to a search for fruits or products of an offense, the instrumentality or means of committing the offense, contraband or other property the possession of which is an offense, the person who committed the offense, and under circumstances for evidentiary matters.